**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-12239 (CSS) |
| Debtor. | **Hearing Date: Nov. 19, 2019, at 12:00 p.m. (ET)**<br>**Obj. Deadline: Nov. 12, 2019, at 4:00 p.m. (ET)** |
| | **Docket Ref. Nos. 5, 75, 77** |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTOR'S (I) MOTION FOR FINAL ORDER AUTHORIZING
CONTINUANCE OF THE EXISTING CASH MANAGEMENT SYSTEM, (II) MOTION
TO EMPLOY AND RETAIN DEVELOPMENT SPECIALISTS, INC. TO PROVIDE A
CHIEF RESTRUCTURING OFFICER, AND (III) PRECAUTIONARY MOTION FOR
APPROVAL OF PROTOCOLS FOR "ORDINARY COURSE" TRANSACTIONS**

The official committee of unsecured creditors (the "<u>Committee</u>") of Highland Capital

Management, L.P. (the "<u>Debtor</u>" or "<u>Highland</u>") hereby submits this omnibus objection to (I) the

*Motion of Debtor for Interim and Final Orders Authorizing (A) Continuance of Existing Cash*

*Management System and Brokerage Relationships, (B) Continued Use of the Prime Account,*

*(C) Limited Waiver of Section 345(b) Deposit and Investment Requirements, and (D) Granting*

*Related Relief* [Docket No. 5] (the "<u>Cash Management Motion</u>"), (II) the *Motion of Debtor*

*Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc.*

*to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and*

*Restructuring-Related Services,* Nunc Pro Tunc *as of the Petition Date* [Docket No. 75] (the

"<u>DSI Retention Motion</u>"), and (III) the *Precautionary Motion of the Debtor for Order Approving*

*Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business*

[Docket No. 77] (the "<u>Ordinary Course Protocols Motion</u>," and together with the DSI Retention

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Motion and the Cash Management Motion, the "Motions").  In support of its opposition to approval of the Motions, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The Committee was formed two weeks ago, on October 29, 2019,[2] and is in the process of gathering information and familiarizing itself with the Debtor's opaque and complex organizational structure, business operations, and assets under management.[3]  As the Court may be aware, however, certain members of the Committee have been engaged in highly contentious litigation with the Debtor and, as a result, are intimately familiar with the business practices of the Debtor and its principals, including Mr. James Dondero.[4]  A variety of courts, arbitration panels, and administrative tribunals have made troubling findings in recent years that the Debtor and its principals have, among other things, (i) breached their fiduciary duties to investors, (ii) engaged in intentional fraudulent transfers (many times moving assets offshore into judgment-proof entities), willful misconduct, and self-dealing, and (iii) siphoned-off assets of the Debtor. The Committee is extremely concerned that the Debtor and Mr. Dondero are likely to continue such questionable conduct.[5]  Rigorous oversight of the Debtor and its assets and operations and,

---

[2] On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief commencing this chapter 11 case, and the United States Trustee appointed the Committee approximately two weeks later on October 29, 2019 [Docket No. 65].  The Committee moved quickly following its appointment to retain Sidley Austin LLP ("Sidley") as its proposed counsel and FTI Consulting Inc. ("FTI") as its proposed financial advisor.  The Committee has served both formal and informal discovery requests on the Debtor.

[3] As one bankruptcy court recently found, the Debtor's organizational structure consists of "approximately 2,000 separate business entities."  *In re Acis Capital Mgmt.*, 584 B.R. 115, 119 (Bankr. N.D. Tex. 2018).

[4] Mr. Dondero owns 100% of equity in the Debtor's' general partner, Strand Advisors, Inc., and, in that capacity, signed the authorization for the Debtor to commence its chapter 11 case.  *See* Voluntary Petition [Docket No. 1]; *Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 9], ¶ 51.

in particular, its transactions with other entities that may be controlled by Mr. Dondero or individuals who may be acting in concert with him, is needed to ensure that the rights of the Debtor's creditors are protected and the value of the Debtor's assets is maximized.

2.    The Committee opposes approval of the Motions because the relief the Debtor has requested could allow the Debtor and Mr. Dondero to continue their questionable conduct under the guise of "ordinary course" practices.  The Committee agrees that this case requires "complete transparency and fairness with respect to the Debtor's insider relationships" (DSI Retention Motion, ¶ 6), but the half-measures the Debtor has proposed leave too much ambiguity for Mr. Dondero and other insiders to exploit.  As described in detail below, the Debtor (under the control of Mr. Dondero) has been found on multiple occasions to have breached its fiduciary duties to investors and has made material misrepresentations to investors and to its auditor.  The Committee believes that Mr. Dondero, in particular, cannot be trusted to act in the best interests of the Debtor's estate.  The Committee is also concerned that the Ordinary Course Protocols Motion and certain aspects of the DSI Retention Motion, if approved, would potentially cement in place an inadequate corporate governance structure with insufficient oversight of the Debtor's business operations by the Court and the Committee, and leave too much control ultimately vested in Mr. Dondero.

3.    Specifically, the Committee is concerned that the proposed protocols set forth in the Ordinary Course Protocols Motion are inadequate to prevent Mr. Dondero from engaging in self-dealing transactions with the Debtor.   Indeed, each of the Debtor's business lines provides opportunities for malfeasance: (a) the Debtor trades through non-debtor affiliates controlled by

---

[5] The Committee and its advisors intend to closely scrutinize all prepetition and post-petition transactions involving the Debtor to determine whether any are avoidable and/or give rise to claims against Mr. Dondero and other insiders, including other entities that may be controlled by or under the influence of Mr. Dondero.

Mr. Dondero; (b) the Debtor's investment management services create an opportunity for Mr. Dondero to deplete value from the Debtor's estate via redemptions, improper subsidization of affiliates' operating expenses, and the payment of above-market management fees to entities he controls; and (c) the shared services that the Debtor provides to its affiliates likewise create an avenue for value to improperly flow to non-debtor affiliates if the Debtor is not adequately compensated in return. The proposed protocols are wholly inadequate to protect the Debtor against self-dealing and conflicts of interest, because they (i) allow Mr. Dondero to remain in control of the Debtor and (ii) seek to designate far too many types of extraordinary transactions as being "ordinary course." The Committee views the protocols as, at best, half-measures that are intended to create the appearance of independence and impartiality when, in fact, nothing has changed. Mr. Dondero remains in control of the Debtor, pulling the strings of the roughly 2,000 entities within the Debtor's organizational structure while the proposed Chief Restructuring Officer ("CRO") is left to determine whether a particular transaction is "ordinary course" and whether any entities affiliated with Mr. Dondero are on the other side. It is entirely unclear what information will be made available to the CRO and when, and how, the CRO is expected to evaluate such information given his limited involvement with the Debtor.[6] This situation is a recipe for disaster, and the Court should not countenance it by approving the protocols.

4.    The DSI Retention Motion is similarly problematic because it seeks approval of a corporate governance structure rife with potential conflicts of interest and insufficient oversight. To start, the proposed CRO, Mr. Bradley Sharp, will continue to report to Mr. Dondero with respect to all matters related to the Debtor's restructuring, allowing Mr. Dondero to make the final decision on matters that could benefit him or his affiliates personally. *See* DSI Retention

---

[6] The Committee has been informed that DSI and the CRO were engaged by the Debtor on October 7th and only started their work during the week of October 21st.

Motion ¶ 10(b)(i).  Furthermore, the CRO protocols that are set forth in Exhibit A to the DSI Retention Motion (the "DSI Engagement Letter") do not provide for sufficient oversight of the Debtor, its management and operations, and, in particular, any transactions between or among the Debtor and its non-debtor affiliates, and they seek to put in place a governance structure that is woefully inadequate for this case.  For example, the DSI Engagement Letter states that the CRO "will have ability to approve" any transaction with an entity in which Mr. Dondero has any direct or indirect ownership interest, or any affiliate of such entity, but this language does not require oversight of all interested transactions.  The Debtor should be required to seek Court approval, and not just the CRO's blessing, for all transactions with insiders.  And, the DSI Engagement Letter provides that the CRO will have "exclusive authority" to determine whether a transaction is in the ordinary course of the Debtor's business, but such decisions should be made by the Court after notice and a hearing, particularly if there is any question about whether insiders are involved or receiving benefit.  Finally, the DSI Engagement Letter states that the CRO will have "exclusive power" to pursue claims against insiders and affiliates even though the CRO will continue to report to Mr. Dondero and, indeed, can be fired by Mr. Dondero for any reason or no reason at all.  This power also includes the collection of any receivables owed by insiders (including  millions of dollars owed to the Debtor by Mr. Dondero) and *qualified* authority to prosecute any avoidance actions.  *See* DSI Engagement Letter, at 2 ("CRO will take into account whether there are sufficient assets in the estate to pay all creditors in full without prosecuting avoidance actions.").  Such terms should not be authorized except under a confirmed chapter 11 plan.  In sum, the CRO protocols create the appearance of oversight by independent professionals, but they leave far too many loopholes and opportunities for mischief by Mr. Dondero and other insiders.

5.      Finally, the Committee is concerned that the Cash Management Motion provides additional avenues for Mr. Dondero to siphon value from the Debtor's estate in the absence of appropriate oversight.[7]  As an initial matter, the Debtor holds the majority of its bank accounts at NexBank, SSB ("NexBank") – a bank owned indirectly by Mr. Dondero and Mr. Mark Okada (co-founder and minority owner of the Debtor).  It is inappropriate, and frankly unprecedented, for the Debtor's cash to sit in a bank controlled by its insiders.  Furthermore, each of the proposed intercompany transactions raises significant concerns for the Committee and requires closer scrutiny.  It is not clear from the Cash Management Motion that the proposed intercompany transactions provide any benefit to the *Debtor*.  As more fully described below, each of the intercompany transactions involves cash flowing to non-debtor affiliates with no immediate (if any) compensation or other benefits for the Debtor.  Mr. Dondero has an established history of using affiliated entities to strip value away from creditors, and should not be allowed to continue doing so under the guise of "ordinary course" intercompany transactions. There should be a strict delineation between the Debtor and its non-debtor affiliates, and all transactions between or among the Debtor and any affiliated entities should be closely scrutinized.

6.      The Committee requests that each of the Motions be continued until the Committee has had a chance to complete its diligence and ensure that appropriate safeguards are in place to protect the Debtor's estate.[8]  However, if the Court is inclined to consider the Motions

---

[7] Each of the DSI Retention Motion and the Ordinary Course Protocols Motion also include requested relief with respect to intercompany transactions.  To ensure that the Court is not granting conflicting relief with respect to intercompany transactions, the Committee submits that the propriety of intercompany transactions should be determined only in connection with the Cash Management Motion.

[8] Additionally, the Committee respectfully requests that this Court first consider the Committee's motion to transfer venue [Docket No. 86] (the "Venue Transfer Motion") before adjudicating the Motions.  If the

at this time, the Committee respectfully requests that the Court (a) only approve the Cash Management Motion on a further interim (rather than final) basis,[9] and closely scrutinize any transactions between or among the Debtor and its affiliates, (b) approve the terms of DSI's engagement by the Debtor solely with respect to DSI serving as the Debtor's financial advisor (i.e., without approving any governance protocols that are set forth in the DSI Retention Motion or granting the CRO any investigative powers), and (c) deny the Ordinary Course Protocols Motion.

## SUMMARY OF FINDINGS REGARDING THE DEBTOR'S BUSINESS PRACTICES

7.    For the Court's benefit, the Committee has included in this objection a summary of various findings regarding the Debtor made by courts, arbitration panels, and administrative tribunals in recent years.  Such findings demonstrate that the Debtor's business practices and transactions with affiliates must be closely scrutinized, and that the Debtor, Mr. Dondero, and his leadership team have proven themselves willing to violate even strict oversight structures that were put in place by courts supervising other bankruptcy proceedings in which the Debtor was involved.

**I.    The SEC Administrative Proceedings.**

8.    On September 25, 2014, the Securities and Exchange Commission (the "SEC") instituted administrative and cease-and-desist proceedings against Highland pursuant to

_____

Court is inclined to grant the Venue Transfer Motion and transfer this case, the transferee court should hear and decide the Motions.

[9] The Committee requests that any further interim relief be subject to the following conditions: (i) aggregate expenditures for Intercompany Transactions do not exceed $1.7 million from the Petition Date through the term of the interim order and such expenditures are commercially justifiable and inure to the benefit of the estate (e.g., only entering into loans with market interest rates and appropriate security); (ii) with respect to shared services, the Committee reserves its rights to all expense allocations; and (iii) pending establishment of protocol to confirm adequate confirm adequate oversight, all trading activity and any additional borrowing amounts on margin in the Jefferies Prime Brokerage Account should cease on the basis that funding of operations is restricted to the Highland Select Fund.

Sections 203(e), 203(i), and 203(k) of the Investment Advisors Act of 1940 (the "<u>Advisors Act</u>"), captioned *In the Matter of Highland Capital Mgmt., L.P.*, File No. 3-16169 (the "<u>SEC Administrative Proceedings</u>").[10]    The SEC commenced the SEC Administrative Proceedings following "certain instances by Highland of trading securities between its clients' accounts and accounts in which Highland and its principals maintained an ownership interest."    *See* SEC Order ¶ 2.    The SEC determined that Highland knowingly engaged in multiple transactions with its client advisory accounts without disclosing that Highland was acting as principal, or obtaining client consent, before the trades were completed.    Many of such trades took place during September and October 2008 – the onset of the Great Recession.    *See* SEC Order ¶¶ 6-7.    During the relevant time period, Highland also failed to maintain sufficient documentation in relation to certain principal transactions.    *Id.*    In response to these violations, the SEC mandated that Highland retain a qualified independent compliance consultant and implement all recommendations made by such consultant.    *See* SEC Order ¶¶ 12-26.    The SEC also ordered Highland to cease and desist from committing any future violations of the Advisors Act and pay a civil penalty.    *See id.*, Sec. IV.

## II.    The Redeemer Committee Litigation.

9.    Beginning in 2006, Highland was the investment manager for Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund II, Ltd., and Highland Crusader Ltd. (collectively, the "<u>Crusader Fund</u>").    The Crusader Fund's assets lost significant value in September and October 2008, and on October 15, 2008, the Debtor placed the Crusader Fund in wind-down, compulsorily redeeming the Crusader Fund's limited partnership interests, and declared it would liquidate the Crusader Fund's remaining assets for

---

[10] A copy of the order instituting the SEC Administrative Proceedings is attached hereto as **<u>Exhibit A</u>** (the "<u>SEC Order</u>").

distribution to investors.  Disputes soon arose as certain investors asserted that Highland and its senior executives (principally, Mr. Dondero) had engaged in self-dealing, conflicted transactions, and other violations of their fiduciary duty to the Crusader Fund, and an involuntary winding up proceeding that was commenced in Bermuda against Highland Crusader Fund II, Ltd.  In July 2011, Highland, the Crusader Fund, and most investors of the Crusader Fund adopted the Joint Plan of Distribution (the "Crusader Plan")[11] and Scheme of Arrangement approved by the Supreme Court of Bermuda.

10.     Given the significant allegations of Highland's wrongdoing, the Crusader investors insisted that the Crusader Plan include numerous safeguards to prevent Highland from engaging in self-dealing, or otherwise acting to benefit Highland to the investors' detriment.  *See* Partial Final Award (dated March 6, 2019) at 2-3.[12]   A foundational protection was the establishment of the committee of Crusader Fund investors (the "Redeemer Committee"), "which was created so as to allow the investors in the Funds to have a greater level of influence over the affairs of Highland Capital than an ordinary creditors' committee would have in the liquidation of the Fund." *Id.* at 3.

11.     The Crusader Plan imposed significant restrictions on Highland's ability to conduct business with, or trade equity interests in, the Crusader Fund, and granted the Redeemer Committee the authority to protect the investors' interests with respect to these transactions.  For example, Highland and its affiliates were prohibited from engaging in transactions with the Crusader Fund absent the Redeemer Committee's prior approval.  Highland and its affiliates were prohibited from acquiring any equity interests in the Crusader Fund unless the Redeemer

---

[11] A copy of the Crusader Plan is attached hereto as **Exhibit B**.

[12] A copy of the Partial Final Award, dated March 5, 2019 (the "Partial Final Award"), is attached hereto as **Exhibit C**.

Committee approved, and Highland was required to offer the Redeemer Committee the opportunity to cause the Crusader Fund to purchase those interests for the fund's benefit (i.e., a right of first refusal) before it could acquire any such interests. *See* Partial Final Award at 21, 25, 34.

12.    In April 2016, the Redeemer Committee discovered that Highland had covertly and improperly taken $32.3 million in cash out of the Crusader Fund. The Redeemer Committee then terminated Highland as investment manager for the Crusader Fund, and brought claims against Highland in arbitration for its repeated breaches of the Crusader Plan and its fiduciary duties to the Crusader Fund. The arbitration panel (the "Panel") consisted of three members selected by the parties: the Honorable John Martin (retired District Court Judge, S.D.N.Y.), Michael Young, and David Brodsky (chair). The Panel unanimously issued three partial final awards and one final award (collectively, the "Awards")[13] against Highland.

13.    The Panel found that Highland, Mr. Dondero, and Highland's in-house lawyers violated their fiduciary duties to the Crusader Fund, engaged in willful misconduct, self-dealing, and secrecy, and made multiple misrepresentations to the Redeemer Committee and the Crusader Fund's investors, as well as Highland's auditors. The Panel found that Mr. Dondero was actively involved in the misconduct and that Highland's General Counsel, Scott Ellington, and its Assistant General Counsel, Isaac Leventon, were integral to implementing Highland's deceitful

---

[13] In its first Partial Final Award on April 21, 2017, the Panel awarded the Redeemer Committee injunctive relief ordering Highland to turn over the books and records of the Fund to the Redeemer Committee pursuant to Section 2.05(a) of the Plan, because Highland had refused to abide by its disclosure obligations under the Plan and Scheme.

In its second Partial Final Award on July 20, 2017, the Panel ruled against Highland on Highland's counterclaims for advancement of its legal fees and injunctive relief.

On May 9, 2019, the Panel issued the Final Award (the "Final Award"), a copy of which is attached hereto as **Exhibit D**, inclusive of damages, attorneys' fees, and costs, fully and finally resolving all remaining issues in the Arbitration.

schemes.  The following discussion summarizes three of the schemes that Highland perpetrated, despite the strict requirements of the Crusader Plan:[14]

> ### A.    Highland Improperly Took $32.3 Million from the Crusader Fund as "Deferred Fees."

14.     In early 2016, Highland unilaterally took $32.3 million in cash from the Crusader Fund for itself, claiming it was entitled to such amount as "Deferred Fees" under the Crusader Plan.  Partial Final Award at 14.  Although the Crusader Plan did provide Highland the opportunity to earn Deferred Fees, they were only to be paid to Highland upon the "'complete liquidation' of the Crusader Funds' assets."  Partial Final Award at 9.  The deferral of the payment was a key feature of the Crusader Plan—"an incentive to Highland to complete [the] liquidation of the portfolio[.]"  *Id.* at 14.  At the time Highland took the Deferred Fees, there was no question that this condition had not been satisfied.  Indeed, the Crusader Fund still has not completed the liquidation of its assets as of this date, and the condition has not yet been satisfied.

15.     Highland, however, asserted that it was entitled to the Deferred Fees under the "impossibility doctrine:"  It claimed it could not liquidate the Crusader Fund's assets for a period due to a temporary restraining order issued in a separate litigation with UBS; in other words, Highland claimed it would have received the Deferred Fees "but for" the restraining order.  *Id.* at 10.

16.     Highland's General Counsel, Mr. Ellington, testified in support of this position that "in January 2016, he and others spoke on several occasions with lawyers from [Highland's outside counsel] Akin Gump regarding the premature taking of the Deferred Fees, and that he received the advice that 'the deferred fees could be taken under the circumstances,' that it was a

---

[14] The Committee is filing the two principal arbitration decisions attached as **Exhibits C** and **D** to this Objection under seal so that this Court has the opportunity to fully comprehend the breadth and depth of Highland's pervasive misconduct.

calculated risk and that, if successfully challenged, Highland would only owe 'nominal interest.'" *Id.* The Panel found that Mr. Ellington's testimony was not true. As the Panel explained, "Mr. Ellington's testimony is not supported by the hourly billing records of Akin Gump, which do not show any time being billed in January 2016 for anything having to do with this or any other Highland-related issue." *Id.*

17.    The Panel also found that Highland had considered using the "impossibility defense" affirmatively to justify taking cash from the Crusader Fund on multiple prior occasions, but was advised the doctrine did not apply. *Id.* at 12. The Redeemer Committee also strongly rejected this position when Highland raised it. *Id.* The Panel found that "[n]otwithstanding two prior and unsuccessful attempts to use the doctrine to evade its obligations, Highland was not deterred and in late 2015 and early 2016, with the assistance of its inside counsel, but not on the advice of Akin Gump, planned for and then executed on the strategy to take the Deferred Fees." *Id.* It was clear to the Panel that Highland's inside counsel knew that the defense did not apply to Highland's taking of $32.3 million from the Crusader Fund. *Id.* at 14 ("Indeed, we find that Highland – and its inside counsel – knew none of the factors were applicable when Highland asserted the defense."). The Panel concluded that "Highland's reliance on the UBS TRO was pretextual to support Highland's true goal of benefiting itself over the interests of the Fund and the Committee." *Id.* at 30. The Panel also found that, after Highland took the $32.3 million, it intentionally misled the Crusader Fund's auditors, PwC, to conclude that the Redeemer Committee had approved Highland's conduct, and that Highland did that "so as to induce PwC to provide the opinion Highland needed to have clean financials." *Id.* at 11.

**B.     Highland Purchased Crusader Fund Equity Interests in Violation of the Crusader Plan.**

18.     When negotiating the Crusader Plan, investors were concerned that Highland could later "strong-arm" investors to sell their equity interests in the Crusader Fund to Highland at below fair value prices.  To prevent that, the Crusader Plan expressly requires that all transfers of such equity interests to Highland or its affiliates may only be consummated with express approval of the Redeemer Committee and after the Redeemer Committee is offered a right of first refusal ("ROFR").  Partial Final Award at 26; Crusader Plan §§ 2.05(f), 5.04.  The Crusader Plan refers to such equity interests in the Crusader Fund as "Plan Claims."

19.     The Panel found that Highland engaged in willful misconduct by purchasing twenty-eight Plan Claims in the Crusader Fund in violation of the Crusader Plan.  Highland pursued a complex and secret scheme orchestrated by Mr. Dondero and carried out by Mr. Leventon, Highland's Assistant General Counsel:

(a)     First, Highland caused (without the Redeemer Committee's knowledge) the Board of Crusader's Master Fund to prospectively approve any transfers of interests in the Crusader Fund to Mr. Dondero, Highland, or its affiliates, so long as they offered the highest price.

(b)     Second, Mr. Leventon used that resolution on Highland's behalf to lay "the groundwork for purchasing the Plan Claims for itself and bypassing the Committee's ROFR," by "[u]sing that Resolution [to inform] multiple investors interested in possible transfers of their interests, that Highland had a ROFR to purchase any Plan Claims, [and] never mentioning the [Redeemer] Committee's prior and superior ROFR."  Partial Final Award at 27.

(c)     Third, "Highland hired a broker to solicit all Fund investors, except those who were on the [Redeemer] Committee, to buy their interests at half or approximately half of the NAV that Highland had itself set."  *Id*. at 27.  Highland instructed the broker, Wake2O, to only "reach out to all *non-committee* members" and use Highland-drafted talking points that misrepresented on whose behalf Wake2O was acting, and represented, without apparent foundation, that the offering price of 50% or 55% of the net asset value was '[t]he current best market bid' and that price would go down in the future."  *Id*. at 28-29 (emphasis added).  In doing so, Highland schemed "to purchase a majority of the [Crusader] Fund without the [Redeemer]

Committee's knowledge," using misrepresentations and deceit to acquire Crusader Fund interests at a steep discount. *Id.* at 28.

20.     The Panel found that Mr. Dondero was the driving force behind this operation: "Throughout Wake2O's engagements, [Wake2O] was under pressure from Highland's CEO to pursue investors so that Highland could obtain a greater share of the Fund." *Id.* at 29.   Mr. Leventon, in executing the scheme, lied to Crusader Fund investors: "Highland continued misrepresenting to investors that it had a ROFR and never mentioned in its communications that the [Redeemer] Committee was the entity actually possessing that right. *Mr. Leventon was the principal instrument through which this misrepresentation and omission were communicated.*" *Id.* at 30 (emphasis added).

21.     As a result of Highland's secret scheme, Highland acquired a substantial number of equity interests in the Crusader Fund for drastically less than the fair value of those interests, in violation of the Crusader Plan.   It again tried to use the "impossibility defense" to justify its affirmative conduct.   Unsurprisingly, the Panel found that Highland's reliance on impossibility "was a façade, designed to enable Highland to attempt to purchase a majority interest in the Fund without the Committee's knowledge." *Id.* at 28.   The Panel held that Highland had committed willful misconduct and breached its fiduciary duty to the investors, and ordered Highland to return the equity interests, and all distributions it had received on account of those interests, to the Crusader Fund with interest. *Id.* at 30, 53.

### C.     Highland Used Straw Purchasers to Buy Crusader Fund Assets.

22.     Highland also violated the Crusader Plan's prohibition on related-party transactions by causing the Crusader Fund to sell its assets to Highland affiliates at a discount without disclosing the transactions to the Redeemer Committee—much less receiving its required approval. *See* Partial Final Award at 34.   In late 2013 and early 2014, Highland caused

14

the Crusader Fund to sell numerous shares of interests in collateralized loan obligations (commonly called "CLOs"), telling the Redeemer Committee that sales were to third parties.  In reality, Highland used a straw buyer as a middleman to purchase the shares at one price, only to then resell the shares to a Highland affiliate for a higher price, oftentimes before the first transaction had even closed.  *See* Partial Final Award at 35 ("Highland sold the CLOs to a broker for one value and then the broker turned around and sold the CLOs to the Highland affiliate for a higher value. Thus, the Fund received less than it was entitled to receive had the transaction been done without the middleman. . .").

23.    The Panel found that Highland orchestrated these straw purchases by design to "avoid obtaining the consent of the [Redeemer] Committee."  *Id*.  As the Panel observed, Mr. Dondero was recorded on tape instructing a subordinate to execute a CLO trade through a straw man purchaser.  *Id*. at 35.  The Panel held that Highland breached the Crusader Plan and its fiduciary duty to investors by engaging in these self-dealing transactions, and ordered Highland to pay the Crusader Fund the difference between the low price the Fund received, and the higher price actually paid for the shares.  *Id*. at 35, 55.

### D.    The Panel Awarded the Redeemer Committee its Attorneys' Fees and Costs.

24.    Finally, the Panel awarded the Redeemer Committee its attorneys' fees and costs for prosecuting the Arbitration, finding:

> [W]ith respect to **each of the claims** on which we have determined that the Committee is entitled to prevail, we have noted above the many occasions where, during the time it was investment manager and thereafter, Highland engaged in conduct that breached the Plan, breached fiduciary duties, **involved secrecy, misrepresentations, and false statements by the most senior executives, and constituted willful misconduct**.  Furthermore, **large portions of the defense set forth by Highland's witnesses were unworthy of belief** and reflect the fact that Highland knew that it had no legitimate defense to many of the Committee's claims.  Accordingly, in our discretion, based on the foregoing, we

> award Claimant its legal fees and costs for the litigation of this arbitration.

*Id.* at 53 (emphasis added).

25.     The Awards are powerful evidence that Highland, Mr. Dondero, and his leadership team cannot be trusted to abide by court-imposed rules.  Despite the detailed Crusader Plan that set clear limits on Highland's actions, and despite oversight by the Redeemer Committee, Highland continued to engage in self-dealing and breaches of fiduciary duties.  The Panel's rulings leave no question as to the lack of trustworthiness of Highland, Mr. Dondero, and Highland's in-house lawyers.

**III.     The Acis Bankruptcy Cases.**

26.     As set forth in the Venue Transfer Motion, the Debtor has been actively involved in the involuntary chapter 11 cases of its former affiliates Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, L.P. ("Acis GP," and together with Acis LP, "Acis") pending in the United States Bankruptcy Court for the Northern District of Texas (the "Dallas Bankruptcy Court") and captioned *In re Acis Capital Mgmt., L.P.*, Case No. 18-30264 (SGJ) (the "Acis Bankruptcy Cases").  Acis was the structured credit arm of the Debtor.  *In re Acis Capital Mgmt., L.P.*, No. 18-30264 (SGJ), 2019 WL 41719, at *5 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019).  When the Acis Bankruptcy Cases were commenced on January 30, 2018, there was complete overlap between Acis and the Debtor at the executive level, with Mr. Dondero serving as President of Acis and the Debtor's Chief Financial Officer and first day declarant, Frank Waterhouse, serving as Treasurer.

27.     Prior to the commencement of the Acis Bankruptcy Cases, Acis and the Debtor were parties to litigation with Joshua Terry, stemming from the Debtor's termination of Mr. Terry's employment in June 2016.  *See In re Acis Capital Mgmt., L.P.*, 584 B.R. 115, 120

(Bankr. N.D. Tex. 2018).  Mr. Terry ultimately obtained a $7.9 million arbitration award against

Acis on October 20, 2017, based on claims of breach of contract and breach of fiduciary duties.

Indeed, the arbitration panel found:

> Highland's termination of Terry was, in fact, pre-textual, without basis of cause and only because Dondero wanted him gone. Terry's opposition to Dondero's . . . plan was not self-dealing and not a breach of fiduciary duty.  Terry's opposition to Dondero's plan to not pay investors and extend past due and near due notes was appropriate and was ultimately accepted by all to be the correct approach to complete the Trussway/Targa acquisition. Dondero was simply angry and realized Terry was not a "yes man" willing to let Dondero have his wrongheaded way, so Dondero fired Terry on the spot and later sought to characterize Terry's termination of employment as "for cause."

*See* Final Award (dated October 20, 2017), at 10.[15]

28.     The Texas state court confirmed the arbitration award in December 2017.  During

the process of pursuing post-judgment discovery, Mr. Terry discovered a number of suspicious

transactions and transfers that he believed were "pursued without any legitimate business

purpose and with the purpose of denuding Acis LP of its assets and to make it judgment proof."

*In re Acis Capital Mgmt., L.P.*, 584 B.R. at 120.  These transactions included the following,

which started just days after the issuance of the arbitration award on October 20, 2017:

(a)     the October 24, 2017 transfer of Acis LP's 15% interest in Acis Loan Funding, Ltd. ("<u>ALF</u>")[16] back to ALF (with "[n]o credible business

---

[15] A copy of the Final Award, dated October 20, 2017, is attached hereto as **<u>Exhibit E</u>**.

[16] ALF has three equity owners: "(i) a 49% equity owner that is a charitable fund  (i.e., a donor advised fund or "DAF") that was seeded with contributions from Highland, is managed/advised by Highland, and whose independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally, ALF *may* be 49% owned by a third-party institutional investor based in Boston that Highland believed it was required to keep anonymous at the Trial." *Id.* at 125.

justification" offered for the transaction), which rendered Acis LP unable to continue serving as a CLO manager for regulatory purposes;[17]

(b)     the October 27, 2017 decision of ALF to replace Acis LP as portfolio manager with a newly-formed Cayman Island entity called Highland HCF Advisor, Ltd.;

(c)     the November 3, 2017 assignment and transfer of Acis LP's interests in a note receivable from Highland with a balance of over $9.5 million to another newly-formed Cayman Island entity, Highland CLO Management Ltd.;

(d)     the December 19, 2017 transfer of Acis LP's  "risk retention structure" vehicle and contractual right to receive management fees (with a combined value of $5 million) to yet another newly-formed Cayman Island-based Highland entity, Highland CLO Holdings, Ltd.;

(e)     the December 18, 2017 conveyance of (i) Dugaboy Investment Trust (a Dondero family trust) and Mark Okada's entire limited partnership interests in Acis LP (74.9% and 25%, respectively), to another newly-formed Cayman Island entity called Neutra, Ltd  and (ii) Dugaboy Investment Trust's  100% membership interest in Acis GP to Neutra, Ltd.;[18] and

(f)     the intended February 2018 reset on Acis CLO 2014-3, which would have the effect of depriving Acis LP of a valuable asset, which could realistically be expected to provide millions of dollars of future collateral management fees.

*See id.* at 127-30.   In addition, pursuant to amendments made to Acis' shared services agreements with Highland, "starting soon after Mr. Terry was terminated, the fees owed by the Debtor-Acis to Highland under these agreements shot up to an enormously higher level."  *In re Acis Capital Mgmt., L.P.*, 2019 WL 417149, at *8. Mr. Terry sought a temporary restraining order to halt any further transfers and then filed the involuntary bankruptcy petitions against Acis on January 30, 2018.  *See In re Acis Capital Mgmt., L.P.*, 584 B.R. at 121.

---

[17] The court determined that "[n]o credible business justification was offered for this transaction, other than mostly uncorroborated (and self-serving) statements from Highland witnesses that Acis LP was 'toxic' in the market place (due to litigation with Mr. Terry) and this was a step in the process of extricating Acis LP from the CLO business." *Id*. at 127-28.  The court found the testimony of Highland's witnesses to not be credible. *Id*. at 128.

[18] Mr. Okada testified that he made millions of dollars in equity dividends from his equity investment in Acis LP before he conveyed his interests away for no consideration in return, making the decision all the more suspect.  *See In re Acis Capital Mgmt., L.P.*, 584 B.R. at 130.

29.    Upon consideration of the involuntary petitions, the Dallas Bankruptcy Court "heard considerable evidence involving potentially voidable transfers that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates" and found there was a "legitimate prospect" that the Debtor would "continue dismantling [Acis], to the detriment of Acis LP creditors." *Id.* at 147, 149.    Indeed, "[t]he one thing that the court was wholly convinced of was that conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out for interests of the Alleged Debtors as a fiduciary should." *Id.* at 132 (emphasis added).

30.    Additionally, in connection with confirmation of the Acis debtors' chapter 11 plan, the Dallas Bankruptcy Court found that the plan injunction was necessary to prevent the credible immediate and irreparable harm that Highland could inflict on Acis and its creditors. *See In re Acis Capital Mgmt., L.P.*, 2019 WL 417149, at *10.    The Dallas Bankruptcy Court further concluded that the **"record contain[ed] substantial evidence of both intentional and constructive fraudulent transfers,"** and "[t]he numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear[ed] more likely than not to have been made to deprive the Debtor-Acis of value and with the **actual intent to hinder, delay, or defraud the Debtors' creditors**." *Id.* at *11 (emphasis added).

31.    The Dallas Bankruptcy Court made a number of troubling findings with respect to the trustworthiness of the Debtor's principals.    In connection with deciding the propriety of the involuntary petitions, the court "**found the testimony of almost all of the witnesses for the Alleged Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey plausible deniability**." *In re Acis Capital Mgmt., L.P.*, 584 B.R. at 131 (emphasis added).    There was also conflicting testimony as to the decision-making process:

Highland's in-house lawyers "stressed that Mr. Dondero (the president and manager of the two [Acis] entities) had the ultimate decision making authority for [Acis]. Meanwhile, Mr. Dondero testified that, while he has decision making authority at Acis LP, he usually delegates to Highland's in-house lawyers," i.e., Scott Ellington and Isaac Leventon. *Id.* In connection with confirmation of the Acis plan, the Dallas Bankruptcy Court also found that Highland's General Counsel, Scott Ellington, appeared to have manufactured a narrative to justify prior actions—the fraudulent transfers—testifying to justifications for which there was "no credible evidence." *In re Acis Capital Mgmt., L.P.*, 2019 WL 417149, at *16. Mr. Ellington blamed a passive investor for demanding the fraudulent transfers, but that same passive investor denied the accuracy of Mr. Ellington's testimony. *See id.* Further, the Dallas Bankruptcy Court found that the witnesses of Highland CLO Funding Ltd., a party advised and "controlled by Highland in every way" appeared to "be nominal figureheads who are paid to act like they are in charge, while they are not." *Id.* at *17.

## OBJECTION

32.    The foregoing summary demonstrates that there is a well-established history of the Debtor's principals breaching fiduciary duties to investors, engaging in self-dealing, using affiliated funds to transfer value away from creditors, and concealing transactions with the Debtor's affiliates—even while acting under rules imposed by a liquidation plan approved by a court. As the Redeemer Committee's arbitration award starkly describes, Mr. Dondero and the Debtor's in-house counsel are well versed in developing and then implementing complex stratagems to evade carefully designed, court-approved corporate governance provisions that were expressly designed to prevent such conduct. The Committee believes that Mr. Dondero is simply incapable of acting as a fiduciary for the Debtor and its creditors and that rigorous oversight is needed to ensure that the Debtor is acting in the best interests of its creditors, is fully

disclosing all transactions with its affiliates, and is not engaging in any undisclosed or questionable transactions with entities controlled by or under the influence of Mr. Dondero.

33.     The Committee is concerned that the relief requested in the Motions, taken together, would permit the Debtor to continue its troubling behavior with insufficient oversight. The Debtor and its principals have demonstrated time and time again that they cannot be trusted. The Debtor has done nothing to earn the deference that it seeks pursuant to the Motions.  To the contrary, its pattern of violating fiduciary obligations, deceitful behavior, and self-dealing transactions with affiliated entities warrant close and rigorous scrutiny from the Court and the Debtor's creditors.

**I.      Cash Management Motion.**

34.     As described above, the Debtor has a history of moving value away from its creditors via intercompany transactions (often through sham "middle men," i.e., other entities controlled by Mr. Dondero or individuals within his orbit).  The relief requested in the Cash Management Motion would potentially allow the Debtor to continue such practices while in chapter 11.   Indeed, the Committee has significant concerns regarding the scope of the intercompany transactions with respect to which the Debtor is seeking approval.  Currently, the Debtor appears to be transferring cash to non-debtor entities and receiving little to no value in return.  For example, the Debtor provides $1 million per month in funding to Highland Multi Strategy Credit Fund, L.P. ("MSCF")[19] so that MSCF can pay life settlement policy premiums and fund its other operating costs, but the Debtor only receives 0% interest notes in return with no apparent guarantee of repayment (or any reimbursement from the other investors in MSCF). The Debtor apparently assumes that MSCF's investments will eventually become liquid and will

---

[19] The Committee has been informed that the Debtor holds a minority ownership interest in MSCF but is funding 100% of the policy premiums.

allow MSCF to repay the notes, but in the meantime the Debtor assumes the risk of non-payment

and does not appear to be appropriately compensated for taking that risk.

35.    The Committee has similar concerns regarding the intercompany transactions

involving Highland Capital Management Korea Limited, Highland Capital Management Latin

America, L.P., and Highland Capital Management (Singapore) Pte Ltd.:

(a)    The Debtor has provided its non-debtor subsidiary Highland Capital Management Korea Limited ("HCM Korea") with a $20 million revolving note to cover funding calls from an investment fund, HCM Korea Fund, of which HCM Korea is a minority limited partner.[20]  HCM Korea is not paying any interest on the note and is expected to draw an additional $3 million (for a total of $6 million outstanding) over the next one to two years.  The Debtor's return on investment appears to be a mere assurance that HCM Korea "will repay the note as the HCM Korea Fund realizes gains on its portfolio and distributes those gains to investors."  Cash Management Motion, ¶ 16.b.

(b)    Similarly, the Debtor contributes equity to non-debtor subsidiary Highland Capital Management Latin America, L.P. ("HCM Latin America") to cover the costs of consultants involved in advising and marketing the "SA Fund."[21]  The Debtor anticipates providing HCM Latin America with equity contributions of $1-1.5 million per year, in addition to its previous $700,000 equity contribution, until the Argentinian market recovers.  The Debtor, in return, purportedly believes that the equity contribution will lead to returns on its investment if and when such market recovery occurs.  *See* Cash Management Motion, ¶ 16.c.

(c)    The Debtor also covers the marketing costs of its Singapore subsidiary, Highland Capital Management (Singapore) Pte Ltd ("HCM Singapore").  The Debtor "believes" it will generate an increase in revenue from management fees, and that such revenue would offset the costs paid by the Debtor. Moreover, the Debtor notes that HCM Singapore has "solicited investments in the Debtor's managed funds" but has not explained whether such managed funds are 100% owned by the Debtor.  *See* Cash Management Motion, ¶ 16.d.

(d)    The Debtor also provides back office support services to its clients from time to time and then allocates the expenses to the clients for reimbursement.  As noted in the Motions, a large number of the Debtor's "clients" are in fact

---

[20] The Committee has asked the Debtor to explain HCM Korea Fund's ownership structure.

[21] The Committee has asked the Debtor to explain the ownership structure of the SA Fund (as such term is defined in the Cash Management Motion).

affiliates.  Without oversight, Mr. Dondero could easily manipulate the "expense allocation" mechanism to transfer value to non-debtor affiliates.

36.    The Debtor has an established history of utilizing intercompany transactions to transfer value away from its creditors.  The Committee is in the process of conducting formal and informal discovery with respect to the intercompany transactions and respectfully submits that final approval of the Cash Management Motion should not be granted until the Committee has had sufficient time to investigate whether (i) any of the intercompany transactions involve entities owned or controlled by Mr. Dondero or other insiders of the Debtor and (ii) such intercompany transactions are likely to result in any meaningful benefit to the Debtor's estate.

37.    Additionally, the Committee is concerned that the majority of the Debtor's bank accounts are held at NexBank, which is indirectly owned by Messrs. Dondero and Okada.  The Committee does not believe it is appropriate for the Debtor's bank accounts to remain in a bank owned by the Debtor's insiders.  Any final approval of the Cash Management Motion should be conditioned on the Debtor's agreement to promptly move its accounts to a non-affiliated bank that is signatory to a Uniform Depository Agreement with the United States Trustee.

**II.    DSI Retention Motion.**

38.    The Committee does not object to the Debtor's retention of DSI as its financial advisor.  Rather, the Committee believes that the DSI Retention Motion improperly (and prematurely) seeks this Court's approval of a corporate governance structure that is inadequate for this case and leaves far too many opportunities for mischief by the Debtor's insiders.

39.    To start, the Debtor is asking this Court to decide in the first month of this chapter 11 case that the Debtor's proposed CRO should have exclusive powers to investigate and pursue estate claims against insiders.  This relief is entirely inappropriate, particularly given the nascent stage of these proceedings.  The Committee is still in the preliminary stages of its

investigation and should not be prejudiced from seeking any appropriate relief with respect to any potential estate claims against insiders.  Furthermore, it is inappropriate for the CRO to report to Mr. Dondero and be subject to termination by Mr. Dondero for any reason while, at the same time, having the "exclusive power" to pursue claims against insiders (including Mr. Dondero) and affiliates (subject to the qualification that the CRO must "take into account whether there are sufficient assets in the estate to pay all creditors in full *without* prosecuting avoidance actions").

40.    Second, the Committee is concerned that approval of the DSI Retention Motion would potentially permit Mr. Dondero to continue his "ordinary course" activities without any real oversight by the CRO, the Court, or the Debtor's creditors.  DSI and the CRO were only engaged on October 7th and are still in the process of understanding the Debtor's complex organizational structure.  It is particularly inappropriate, under these circumstances, to vest the CRO with the authority to: (i) approve transactions between or among the Debtor and entities in which Mr. Dondero has a direct or indirect ownership interest and (ii) determine whether a transaction is in the ordinary course of the Debtor's business.  The Committee believes that such decisions should be made by the Court after notice and a hearing, and not by the CRO.  Mr. Dondero has already proven on multiple occasions that he cannot be trusted as a fiduciary, and all transactions between or among the Debtor and other entities that he controls must be closely scrutinized.

41.    Finally, the Debtor appears to be seeking approval to continue engaging in intercompany transactions with its affiliates pursuant to the DSI Retention Motion, which relief should be considered in connection with the Cash Management Motion.  Such relief is not appropriate in any event, for the reasons set forth above.

### III.    Ordinary Course Protocols Motion.

42.    The Ordinary Course Protocols Motion gives the Committee considerable cause for concern.  Essentially, the Debtor is seeking this Court's approval to continue engaging in transactions that it considers to be "ordinary course" without any transparency—without needing Court approval, but also without providing any advance notice or even after-the-fact reporting to the Committee.  Whether a transaction is "ordinary course" would be left to the CRO to decide even though the CRO has only been involved with the Debtor for a few weeks.  The CRO, meanwhile, would report directly to Mr. Dondero and could be fired by him for any reason.  The Committee suspects that many of the transactions that the Debtor considers to be "ordinary course" involve non-debtor entities that are controlled by or affiliated with Mr. Dondero.

43.    The Committee finds several aspects of the Debtor's so-called "Ordinary Course Services" to be troubling or to require additional information, including:

(a)    The Debtor buys and sells securities through Highland Select Fund, L.P., a non-debtor entity that is managed (and partially owned) by Mr. Dondero.  The Committee is concerned that this arrangement gives Mr. Dondero significant control over the Debtor's assets without sufficient oversight.

(b)    It is unclear to the Committee whether it makes sense for the Debtor to make additional investments in the Petrocap Entities (particularly in light of the significant distress that oil and gas companies are facing) and whether any of the Debtor's affiliates or insiders, including Mr. Dondero, are also invested in such entities.  The Committee notes that Petrocap is managed by two former employees of the Debtor.

(c)    There is no transparency regarding the hedge funds, private equity funds, separately managed accounts and CLO funds for which the Debtor is providing investment management services.  It is entirely possible, if not likely, that Mr. Dondero is affiliated with or controls certain of such funds.  Debtor's counsel has already advised the Committee that two hedge funds have made redemption requests to the Debtor, and the Committee needs time to investigate whether Mr. Dondero is the one pulling the strings on such redemption requests.  The Committee also needs time to investigate the reasons why the total assets under management by the Debtor appear to have declined in recent years, whether management rights have been transferred away from the Debtor to affiliates (as happened in the Acis Bankruptcy

Cases), and whether the Debtor is being appropriately compensated for its management services.

(d)     The Debtor provides shared services to several of its non-debtor affiliates (including, presumably, other entities owned or controlled by Mr. Dondero). The Committee needs time to investigate whether the Debtor is being fairly compensated for such shared services.

(e)     The Debtor's directors' and officers' insurance coverage ("D&O Insurance") is provided by Governance Re Ltd., a Bermuda entity owned by Messrs. Dondero and Okada. The Committee needs time to investigate whether the terms of the D&O Insurance are "market," as the Debtor contends, or whether the Debtor's estate should obtain D&O coverage from another provider.

In sum, there is little transparency into the Debtor's "ordinary course" business practices. The Committee needs time to investigate whether there are legitimate business justifications for the proposed transactions and whether the Debtor is being fairly compensated for its services to non-Debtor affiliates, among other things. The Committee is concerned that its interests would be irreversibly prejudiced if the Court were to prematurely grant the relief sought in the Ordinary Course Protocols Motion. Indeed, other courts have had to impose injunctions against the Debtor and its principals to ensure that they would not deplete value to the detriment of creditors. *See In re Acis Capital Mgmt., L.P.*, 2019 WL 417149, at *9-10 (temporarily enjoining Highland, affiliates, and related parties from effectuating an optional redemption or liquidating the Acis CLOs and related actions "to avoid immediate and irreparable harm to the Reorganized Debtor").

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Committee respectfully requests that the Court deny the relief requested in the Motions for the reasons set forth herein, or in the alternative, continue the Motions until further notice, and grant such other and any further relief as the Court deems just and proper.

Date:  November 12, 2019
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Jaclyn C. Weissgerber*
Michael R. Nestor (No. 3526)
Edmon L. Morton (No. 3856)
Sean M. Beach, Esq. (No. 4070)
Jaclyn C. Weissgerber, Esq. (No. 6477)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600

-and-

SIDLEY AUSTIN LLP

Bojan Guzina, Esq. (admitted *pro hac vice*)
Matthew Clemente, Esq. (admitted *pro hac vice*)
Alyssa Russell, Esq. (admitted *pro hac vice*)
One South Dearborn Street
Chicago, IL 60603
Telephone:  (312) 853-7000

- and –

Jessica Boelter, Esq.
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 839-5300

- and –

Penny P. Reid, Esq. (admitted *pro hac vice*)
Paige Holden Montgomery, Esq. (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, TX 74201
Telephone: (214) 981-3300

*Proposed Counsel for the Official Committee of Unsecured Creditors*